This is a suit by Mrs. Katherine Warren against the Town of Winnfield, Louisiana for compensation at the maximum rate for a period of three hundred weeks, allegedly due her as the result of the death of her husband while employed by the defendant.
Her petition alleges that her husband died on the afternoon of September 5, 1947, after suffering a heat stroke due to over-exposure to heat from the sun while working in the open on the day of and the day preceding his death and that the death was due entirely to the heat stroke and a gastric hemorrhage, resulting from the heat stroke.
The answer admitted the employment of plaintiff's husband, but denied that his duties, which consisted of cutting the weeds on the sewerage disposal plant premises and cleaning the motors, pipes and other appurtenants, constituted a hazardous employment within the meaning of the Workmen's Compensation Act, Act No. 20 of 1914, as amended, and set forth that her husband's death resulted from a heart ailment or other condition not connected with his employment with the Town of Winnfield.
The District Court awarded compensation to plaintiff and her two minor children, giving written reasons. The case is before us on appeal by defendant from that decision.
Defendant has urged in this Court that the Town of Winnfield is not liable for compensation for injuries to its employees engaged in the operation of its water works and sewerage system. Under Louisiana law a municipality is responsible in compensation for injuries suffered by its employees. See Ridgdell v. Tangipahoa Parish School Board, La. App.,17 So.2d 55, and cases there cited.
Deceased, Troy Warren, was twenty-eight years of age at the time of his death. He was physically handicapped in that he had sustained the loss of one of his legs due to its becoming frozen. There is no proof that he was otherwise disabled. He was a veteran of World War II and evidently healthy enough to have passed the Army physical examination.
The Mayor of Winnfield testified that he knew Warren and knew that Warren was experienced in operating pumps and that on September 2, 1947, Warren was employed by the Town of Winnfield to attend to the pumps and to work out in the yard cleaning up and cutting weeds. Warren worked all day the 2d 3rd and 4th. On the night of the 4th he complained to his wife that he had gotten too hot and requested her *Page 172 
to bathe his foot in cold water. The next day he returned to work at 8:00 a.m. At 11:00 a.m., Mr. Harrell, the Mayor of Winnfield, came to the premises. Warren complained that he was not feeling well and the Mayor suggested that he stay on the job until noon. At noon Warren walked from his work through a wooded road about a quarter of a mile to his home. On arrival there, he was too sick to eat his dinner, complained that he was "burning up inside," went to bed and called for and was given hot drinks. He said he would feel better if he could perspire and got under a blanket. His condition deteriorated and Mrs. Warren sent for a doctor. When the doctor was not prompt in arriving, she left the house and went out in a taxi looking for the doctor. In her absence, about 3:15 p.m., Dr. G. M. Rodgers arrived. He found Warren's temperature to be above 110 degrees F.; that he was having a difficult time breathing; that there was blood about the mouth of a coffee color, which the doctor believed to have been present as the result of a gastric hemorrhage. The doctor remained with him until his death some thirty to forty-five minutes later. He testified that Warren exhibited all the symptoms of a patient who is suffering with and dying of a heat stroke, and was positive in his opinion that Warren's death was caused by heat stroke.
Three other doctors were called in the case, two for plaintiff and one for defendant. Their answers to the hypothetical questions on the whole support the diagnosis of Dr. Rodgers, who treated Warren and observed him closely during the final minutes of his life.
The medical testimony shows that the symptoms of a heat stroke are not hard to recognize. All of the experts, including the one called by defendant, agreed that a doctor who observes a patient is in the best position to determine whether or not he is suffering from a heat stroke, and, as the defendant's own doctor put it, "I think it would be rather unusual for a doctor to miss a diagnosis of a heat stroke."
The defendant contends that the plaintiff did not establish that the labor performed by her husband was strenuous enough to cause a heat stroke. But we conclude, as did the District Judge, that the evidence shows that Warren did suffer a heat stroke and that he was sick and that the condition was in existence before Warren left the job at noon on the 5th, and that this condition progressed rapidly until Warren's death about 4:00 p.m. the same afternoon. We quote from the excellent opinion of the District Judge, with which we heartily agree, and which indicates the rapid progress of Warren's condition on the day of his death:
"The evidence showed that the 4th and 5th were extremely hot days. In fact it is admitted that the temperature was more than 100 degrees during these two days. Deceased worked until about 10 or 10:30 of the morning of the 5th when he had to stop cutting weeds and merely stood around to see that the pump kept running until about 12:00 o'clock when he went to his home. He was offered a ride in an automobile but he preferred to walk a distance of between 1/4 and a 1/2 mile.
"About 11 o'clock of the same morning while deceased was watching the pump and after he had stopped working on account of feeling badly the Mayor, Hon. Eli Harrell, came to the plant and found Warren standing close to the pump and told witness he had been feeling kind of bad and witness requested him to keep the pump going until noon and let the rest of them cut weeds.
"Warren reached home on September the 5th about 12:15 and when he came in the house he told plaintiff (his wife) he was sick and laid down on the bed and said that he was burning up on the inside. She gave him a hot lemonade and placed a heavy blanket over him to get him to break out in sweat but it had no effect and he continued to grow worse and died about 4:00 o'clock in the same afternoon. Plaintiff finally succeeded in getting Dr. Rodgers about 30 or 40 minutes before he died with the result that Dr. Rodgers pronounced him ill with Heat Stroke and certified that to be the cause of his death."
The above quotation, the testimony of Dr. Rodgers that deceased, in his opinion, unquestionably died of a heat stroke, and the opinion of all the medical experts that the doctor who observes a patient is in good position to determine whether or not he is suffering from heat stroke, all fortify our *Page 173 
conclusion that the plaintiff has established by the preponderance of the testimony, lay and medical, that her husband died as the result of excessive heat, resulting from his exertions and the high temperature prevailing while at work for defendant.
It has become well settled in the jurisprudence of this State that compensation is due in cases where death results from excessive heat, whether the heat come from boilers or other artificial means or from excessive heat or overexertion while in the course of employee's duties. Lampkin v. Kent Piling Co., Inc., La. App., 34 So.2d 76, and cases there cited. A similar rule has been adopted in many other states. In the case of Milstead et al. v. Kaylor et al., 212 S.W.2d 610, 613, the Supreme Court of Tennessee stated the rule in that state as being: "Death caused by 'heat prostration, sunstroke or heat exhaustion' is compensable in this state. Patten Hotel Co. v. Milner, 145 Tenn. 632, 238 S.W. 75, King v. Buckeye Cotton Oil Co., 155 Tenn. 491, 296 S.W. 3, 53 A.L.R. 1086."
The judgment is affirmed, with costs.